IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

v.

IELIOT JACKSON,

Defendant.

No. 21-cr-00175
Judge Franklin U. Valderrama

## MEMORANDUM OPINION AND ORDER

Under the Second Amendment, an individual has a right to keep and bear arms. U.S. Const. amend. II. Federal law, however, prohibits the possession and sale of firearms by a specified class of individuals, most notably those convicted of a felony. *See* 18 U.S.C. § 922(g)(1). A federal grand jury indicted Defendant Ieliot Jackson (Jackson), on one count of unlawful possession of a firearm, in violation of § 922(g)(1). R. 1, Indictment.[1] Jackson moves to dismiss the indictment on the grounds that § 922(g)(1) violates the Second Amendment. R. 52, Mot. Dismiss. For the following reasons, the Court denies Jackson's motion to dismiss the indictment.

## Background

Jackson's criminal record prior to this case includes multiple felony convictions under Illinois law, including two 2006 convictions for manufacture or delivery of a controlled substance and a 2019 conviction for identify theft. R. 56, Gov. Resp. at 2; *see also* R. 10, Pretrial Bail Report. Therefore, Jackson is prohibited from possessing a firearm under 18 U.S.C. § 922(g)(1).

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

On or about May 27, 2020, a Chicago Police Department officer observed Jackson hand a firearm to another individual (Individual A). Gov. Resp. at 1. The officer further observed Individual A place the firearm in a car. *Id.* Officers then recovered the firearm—a loaded Israel Weapons Industries model Jericho 941 .40 caliber pistol, bearing serial number J0002179—from the car and arrested both Jackson and Individual A. *Id.* at 1–2; *see also* Indictment. Jackson was on parole when he was arrested for the instant offense. Gov. Resp. at 2.

On March 16, 2021, a grand jury indicted Jackson with possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Indictment. Jackson moves to dismiss the indictment on the basis that the felon in possession charge against him pursuant to § 922(g)(1) is unconstitutional under the Second Amendment. Mot. Dismiss.[2] Similar to many other motions filed by criminal defendants in this District and nationally, Jackson contends that the Government cannot meet its burden to show that § 922(g)(1) is "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Mot. Dismiss at 4 (quoting *New York State Rifle & Pistol Ass'n, Inc., v. Bruen*, 597 U.S. 1, 19 (2022)). For the following reasons, the Court denies the motion to dismiss.

## Legal Standard

"A party may raise by pre-trial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). When

---

[2]Two weeks after Jackson's motion to dismiss was fully briefed, the Seventh Circuit issued *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023). The Court directed the parties to file supplemental briefs addressing the issues raised in that decision, as well as addressing the impact of any other recent Circuit decisions. R. 58.

deciding a motion to dismiss a criminal indictment, the Court assumes that the indictment's factual allegations are true and must "view all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *see also United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (per curiam) ("An indictment is reviewed on its face, regardless of the strength or weakness of the government's case.").

## Analysis[3]

Section 922(g)(1) provides that it is "unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). As stated above, Jackson argues that § 922(g)(1) is unconstitutional because it violates his right under the Second Amendment to bear arms. Mot. Dismiss.

The Second Amendment states: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The issue before the Court is whether Section 922(g)(1) violates Jackson's Second Amendment right to possess firearms.

---

[3]Much of the Court's analysis follows that of *United States v. Brown*, 2023 WL 8236918 (N.D. Ill. Nov. 28, 2023) and *United States v. Ball*, 2023 WL 8433981 (N.D. Ill. Dec. 5, 2023), both of which this Court recently decided.

## I.     Supreme Court and Seventh Circuit Jurisprudence

A brief overview of the Supreme Court and Seventh Circuit's Second Amendment jurisprudence is warranted. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 635 (2008). It stated, however, that "like most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626 (cleaned up).[4] Relevant here, the Court in *Heller* clarified that, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." *Id.* at 626–27. Indeed, until *Heller*, the Supreme Court had never found laws regulating the possession of firearms to be unconstitutional. Two years later, the Court: extended the holding in *Heller* to state and local government regulations through the Fourteenth Amendment[5]; reiterated that the right protected by the Second Amendment was not unlimited; and reaffirmed that its holding in *Heller* did not cast doubt on longstanding firearm restrictions, including those that prohibit the possession of firearms by felons. *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

[5]Because *Heller* involved a restriction by the District of Columbia on possession of firearms, the Court was not required to determine whether the Second Amendment was incorporated against the States.

Following *Heller* and *McDonald*, most federal courts, including the Seventh Circuit, adopted a two-step test for evaluating Second Amendment challenges. *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019), *abrogated by Bruen*, 597 U.S. 1. The first question was "whether the regulated activity falls within the scope of the Second Amendment." *Id.* If the answer was in the affirmative, then the analysis ended, but "if the historical evidence [was] inconclusive or suggests that the regulated activity [was] not categorically unprotected," courts conducted "a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* (cleaned up). If the regulated conducted was at the "core" of the Second Amendment's protection, then courts applied strict scrutiny, but if, the conduct was outside the "core," then the government needed only to show that the law survived intermediate scrutiny. *Bruen*, 597 U.S. at 18–19. This test is known as the "means-end test." *Id.* at 22.

The Supreme Court, however, more recently abolished the "means-end test" in the Second Amendment context. *Bruen*, 597 U.S. at 18–19. It instead held that the proper inquiry is whether the regulation at question is "consistent with the Second Amendment's text and historical understanding." *Id.* at 26. Under this textual-historical analysis, if "the Second Amendment's plain text covers an individual's conduct," then the conduct is "presumptively protect[ed]." *Id.* at 24. If so, then the government must "justify its regulation" of that conduct "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[6] *Id.* The

---

[6]The upshot of the *Bruen* test is that judges must act as historians. This is a fraught task, as not very long ago in this Nation's history, people of African descent were considered three

Government may satisfy this requirement by providing evidence of "distinctly similar" historical regulations addressing a societal problem that has existed since the 18th Century (called a "straightforward historical inquiry"). *Id.* at 26–27. The Court recognized, however, that modern societal and technological issues are not necessarily the same as those faced by the Framers, and therefore acknowledged that courts could adopt a "more nuanced approach" and consider "historical analogies" to determine whether the challenged regulation is "relevantly similar" to historical restrictions. *Id.* at 27. "Central considerations" to this inquiry include "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29 (cleaned up). The Court stated that this approach should neither be a "regulatory straightjacket nor a regulatory blank check." *Id.* at 30. Put another way, the Government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphases in original).

Recently, in *Atkinson v. Garland*, the Seventh Circuit declined to determine the constitutionality of § 922(g)(1), instead remanding the case back to the district court in order for the district court to conduct a "proper, fulsome analysis of the historical tradition supporting § 922(g)(1)," which the district court did not previously have the opportunity to do, as *Bruen* was decided while the case was on appeal. 70

---

fifths of a person and women could not own property and did not have the right to vote. *See* U.S. Const. art. I, § 2, cl. 3; U.S. Const. amend. XIX.

F.4th 1018, 1019–20, 1022 (7th Cir. 2023).[7] Nevertheless, the court provided some guidance regarding the analysis required under *Bruen*. Similarly to *Bruen*, the Seventh Circuit emphasized that the government need not "pinpoint[ ] a dead ringer—a well-established and representative historical *analogue* will do." *Id.* at 1021 (emphasis in original) (cleaned up). Still, pointing to "only a couple of isolated historical facts and incidents, offering no detail about their application and import[,]" is insufficient. *Id.* at 1022. The court listed five questions to "help focus the proper analysis on remand":

1. Does § 922(g)(1) address a 'general societal problem that has persisted since the 18th century?' If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?';

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1);

---

[7]Even more recently, the Seventh Circuit found no plain error with the District Court's determination that § 922(g)(1) was constitutional. *United States v. Miles*, 2023 WL 7480029, at *3 (7th Cir. Nov. 13, 2023). However, the Court gives this finding little weight given the standard applied, as the appellant had not made the argument regarding the statute's constitutionality before the District Court. *Id.* ("To be plain, an error must be clear and uncontroverted at the time of appeal. Since the Seventh Circuit has not yet ruled on § 922(g)(1)'s constitutionality after *Bruen*, the law is unsettled. As a result, the claimed error—if there [is] one—[is] not plain.") (cleaned up); *see also United States v. Williams*, 2023 WL 8251313, at *2 (7th Cir. Nov. 29, 2023) (same).

3. Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1);

4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible;

5. If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* [597 U.S. at 28–29] (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights).

*Id.* at 1023–24 (cleaned up).

## II. Nationwide Trends Post-*Bruen*

The aftermath of *Bruen* was "a flurry of filings across the country challenging various firearms regulations, including, most notably, challenges to the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1)." *United States v. Johnson*, 2023 WL 6690388, at *2 (N.D. Ill. Oct. 12, 2023). As the Government points out in its response, the overwhelming majority of courts that have considered the issue, including several in this District, have concluded that § 922(g)(1) remains constitutional after *Bruen*. *See* Gov. Suppl. Resp. at 6; Resp., Exh. A (listing 192 district court rulings across the

nation finding the statute constitutional post-*Bruen*).[8] The Eighth Circuit similarly has held that *Bruen* did not disturb the Supreme Court's prior "assurances" that felon in possession laws are constitutional, and finding "considerable support in the historical record" that the Nation has historically disarmed persons who are "deemed more dangerous than a typical law-abiding citizen." *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023).[9]

Yet there are several courts, including one circuit court, that have come out the other way. The Third Circuit, sitting *en banc*, found § 922(g)(1) to be

---

[8]Since the filing of the Government's response, numerous courts within this District have issued additional decisions holding that § 922(g)(1) is constitutional under *Bruen. See, e.g.*, *United States v. Bell*, 2023 WL 8475814, at *3 (N.D. Ill. Dec. 7, 2023) (Alonso, J.); *United States v. Griffin*, 2023 WL 8281564, at *7 (N.D. Ill. Nov. 30, 2023) (Coleman, J.); *United States v. Vaughns*, 2023 WL 8258575 (N.D. Ill. Nov. 29, 2023) (Coleman, J.); *United States v. Washington*, 2023 WL 8258654 (N.D. Ill. Nov. 29, 2023) (Coleman, J.); *United States v. King*, 2023 WL 7936754 (N.D. Ill. Nov. 17, 2023) (Bucklo, J); *United States v. Brown*, 2023 WL 8004290 (N.D. Ill. Nov. 17, 2023) (Kendall, J.); *United States v. Hall*, 2023 WL 8004291 (N.D. Ill. Nov. 17, 2023) (Kendall, J); *United States v. Jackson*, 2023 WL 7160921 (N.D. Ill. Oct. 31, 2023) (Bucklo, J.); *United States v. Hardy*, 2023 WL 6795591 (N.D. Ill. Oct. 13, 2023) (Kendall, J.); *United States v. Johnson*, 2023 WL 6690388, at *3 (N.D. Ill. Oct. 12, 2023) (Durkin, J.); *United States v. Agee*, 2023 WL 6443924 (N.D. Ill. Oct. 3, 2023) (Chang, J.); *United States v. Johnson*, 2023 WL 6276562 (N.D. Ill. Sept. 26, 2023) (Kendall, J.); *United States v. Gates*, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023) (Chang, J.). So too have other district courts within this Circuit. *See, e.g.*, *United States v. Sloat*, 2023 WL 8455112 (S.D. Ill. Dec. 6, 2023) (Dugan, J.); *United States v. Sherls*, 2023 WL 8185665 (N.D. Ind. Nov. 27, 2023) (DeGuilio, J.); *United States v. Denruyter*, 2023 WL 8081658 (E.D. Wis. Nov. 21, 2023) (Griesbach, J.); *United States v. Nance*, 3:22-cr-00066 Dkt. No. 82 (W.D. Wis. Nov. 17, 2023) (Conley, J.); *United States v. Drake*, 2023 WL 8004876 (N.D. Ind. Nov. 16, 2023) (Brady, J.); *United States v. Brady*, 2023 WL 7553859 (N.D. Ind. Nov. 13, 2023) (Brady, J.); *United States v. Johnson*, 2023 WL 7284848 (E.D. Wis. Nov. 3, 2023) (Adelman, J.); *United States v. Watson*, 2023 WL 6623774 (E.D. Wis. Oct. 11, 2023) (Griesbach, J).

[9]As another court in this District has acknowledged, two additional circuit courts have found § 922(g)(1) constitutional in light of *Bruen*, but did so "in cases whose procedural posture required something less than de novo review." *Jackson*, 2023 WL 7160921, at *3 n.3 (N.D. Ill. Oct. 31, 2023) (citing *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) (because "*Bruen* did not indisputably and pellucidly abrogate our precedential opinion in [*United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)]," which governed the defendant's case, and which "squarely upheld the constitutionality of the ban on felons' possession of

unconstitutional as applied to a person with a single 1995 misdemeanor of making a false statement to obtain food stamps. *Range v. Atty. Gen. United States of Am.*, 69 F.4th 96, 103 (3d Cir. 2023). It found a lack of "longstanding history and tradition of depriving people *like Range* of their firearms." *Id.* at 106 (emphasis added). It emphasized, "[o]ur decision today is a narrow one" in that it held § 922(g)(1) unconstitutional "only as applied to [Range] given his violation of 62 Pa. Stat. Ann. § 481(a)."[10] *Id.* However, a court within this District has more broadly found § 922(g)(1) unconstitutional. In *United States v. Prince*, the court found that (1) the defendant was covered by the plain text of the Second Amendment, and (2) the government failed to satisfy its "burden to show a history and tradition of 'relevantly similar' analogues to § 922(g)(1)'s permanent, categorical firearm dispossession of all felons," and therefore stated that it was "forced to grant defendant's motion to dismiss the indictment against him under *Bruen*, regardless of whether he is challenging the statute as applied or on its face." 2023 WL 7220127, at *11 (N.D. Ill. Nov. 2, 2023)

---

firearms," the defendant's *Bruen* claim failed); *United States v. Racliff*, 2023 WL 5972049, at *1 (5th Cir. Sept. 14, 2023) (reviewing appellant's challenge to § 922(g)(1) "only for plain error" and concluding that his claim failed under that standard)). As stated above, the Seventh Circuit has also found § 922(g)(1) constitutional under the "plain error" standard. *Miles*, 2023 WL 7480029, at *3.

[10]Similarly, a Southern District of Mississippi court, in a thorough decision, granted a defendant's as-applied challenge to § 922(g)(1) because the government failed to "establish a historical tradition supporting lifetime criminalization of [that defendant's] possession of a firearm." *United States v. Bullock*, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023) (cleaned up) ("[T]he charge against him, and him only, should be dismissed. . . . In plain English, that means that the charge against Mr. Bullock will be dismissed today, and the federal government may continue to prosecute other persons for violating § 922(g)(1).").

(Gettleman, J.).[11] As discussed in more depth below, *see infra* Section IV.C, the Court respectfully disagrees with the reasoning in *Prince* and instead joins the majority of courts in this District and across the nation to find that § 922(g)(1) is constitutional under the framework articulated by *Bruen* and explained in *Atkinson*. The Court starts with whether the plain text of the Second Amendment protects Jackson as a convicted felon.

## III. Plain Text

Recall the text of the Second Amendment: "A well regulated Militia, being necessary to the security of a free State, the right of *the people* to keep and bear Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). Jackson argues that the plain text of the Second Amendment covers his conduct, that is, the possession of firearms by a convicted felon. Mot. Dismiss at 3–4. The Government, on the other hand, contends that "the Second Amendment's protections extend only to 'ordinary, law-abiding, adult citizens,' who are 'members of the political community.'" Gov. Suppl. Resp. at 11 (quoting *Bruen*, 597 U.S. at 31–32; *Heller*, 554 U.S. at 580); *see also* Gov. Resp. at 5–10.

There is no binding Seventh Circuit precedent as to whether the Second Amendment's plain text protects possession of firearms by felons, as the court in *Atkinson* declined to rule on the issue and instead remanded for additional briefing.

---

[11]Since *Prince*, Judge Gettleman has issued several other decisions coming to the same conclusion based on similar rationale. *See United States v. Diaz*, 2023 WL 8019691 (N.D. Ill. Nov. 20, 2023); *United States v. Anderson*, 2023 WL 7531169 (N.D. Ill. Nov. 13, 2023); *United States v. Salme-Negrete*, 2023 WL 7325888 (N.D. Ill. Nov. 7, 2023); *United States v. Daniel*, 2023 WL 7325930 (N.D. Ill. Nov. 7, 2023); *United States v. Delaney*, 2023 WL 7325932 (N.D. Ill. Nov. 7, 2023); *United States v. Freeman*, 2023 WL 7325934 (N.D. Ill. Nov. 7, 2023).

70 F.4th at 1023. District courts within the Circuit are split. *Compare United States v. Brown*, 2023 WL 8004290, at *2 (N.D. Ill. Nov. 17, 2023) (plain text does not protect convicted felons); *United States v. Drake*, 2023 WL 8004876, at *4–5 (N.D. Ind. Nov. 16, 2023) (same); *United States v. Williams*, 22-cv-00121 Dkt. No. 42 (N.D. Ill. May 3, 2023) (same); *United States v. Price*, 2023 WL 1970251, at *4 (N.D. Ill. Feb. 13, 2023) (same and collecting cases) *with United States v. Bell*, 2023 WL 8475814, at *3 (N.D. Ill. Dec. 7, 2023) (plain text covers all persons, including persons convicted of a felony); *United States v. Washington*, 2023 WL 8258654, at *3–4 (N.D. Ill. Nov. 29, 2023) (same); *United States v. Diaz*, 2023 WL 8019691, at *5 (N.D. Ill. Nov. 20, 2023) (same); *United States v. Jackson*, 2023 WL 7160921, at *5–6 (N.D. Ill. Oct. 31, 2023) (same); *United States v. Agee*, 2023 WL 6443924, at *4–5 (N.D. Ill. Oct. 3, 2023) (same); *United States v. Savage*, 21-cr-00631 Dkt. No. 54 (N.D. Ill. June 5, 2023) (same). Other district courts have implied that the plain text includes felons, but have declined to definitely decide the issue, as they found that § 922(g)(1) falls within the United States' historical traditions, pursuant to *Bruen*'s second prong. *See, e.g.*, *Johnson*, 2023 WL 6690388, at *3–4; *United States v. Nance*, 3:22-cr-00066 Dkt. No. 82 (W.D. Wis. Nov. 17, 2023).

Because Jackson, as a convicted felon, is not a "law-abiding citizen," the Government takes the position that he is not among "the people" entitled to bear arms. Gov. Resp. at 5–10; Gov. Suppl. Resp. at 11–17. As Jackson points out, the Government's position that felons fall outside the Second Amendment's plain text relies heavily on the Supreme Court's dicta in *Heller* and *Bruen*. R. 57, Def. Reply at

4. True, as the Government argues, the Supreme Court in *Heller* and *Bruen* associated the right to bear arms with "law abiding" citizens multiple times throughout each respective opinion. Gov. Suppl. Resp. at 13–17 & n.6 (citing *Heller*, 554 U.S. at 631, 635 (the Second Amendment confers an individual "right of law-abiding, responsible citizens to use arms in defense of hearth and home"); *Bruen*, 597 U.S. 1 (characterizing the holders of Second Amendment rights as "law-abiding citizens" fourteen times)).

But neither *Heller* nor *Bruen* involved the issue of felons, much less the issue of the Second Amendment's textual scope as it applies to felons. So, while the Supreme Court in both cases referred to law-abiding citizens in discussing the Second Amendment's scope, it did not *hold* in either case that "the people" was limited to law-abiding people. Put another way, the Court did not hold in either case that non-law-abiding felons were outside the scope of the Second Amendment's plain text. *See United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) (clarifying, after *Heller* but before *Bruen*, that "while some of *Heller*'s language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.'") (cleaned up); *see also Range*, 69 F.4th at 101–02 (despite repeated use of "law-abiding citizens" in *Bruen*, the Supreme Court did not determine whether felons were among "the people" covered by the Second Amendment); *United States v. Rahimi*, 61 F.4th 443, 451–52 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) (same). What's more, in *Heller*, the Supreme Court declared a "strong presumption that the

13

Second Amendment right . . . *belongs to all Americans.*" 554 U.S. at 581 (emphasis added). So, the Court must look beyond the Supreme Court's dicta in *Heller* and *Bruen* to determine whether "the people" as used in the Second Amendment includes felons.

The Government, in support of defining "the people" as excluding felons, points to other rights taken from felons throughout American history, including disallowing felons from voting, serving on juries, and holding elected office. Gov. Suppl. Resp. at 11–12 (citing Cooley, Thomas M., *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868); A. Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998)). The Court finds that the curbing of these "civic rights" is not dispositive of whether "the people" as used in the Second Amendment categorically excludes felons. Contrary to the Government's argument that "the right to bear arms" was historically included among these "political rights" belonging not to the citizenry generally but only to the polity of "First-Class Citizens," Gov. Suppl. Resp. at 11–12, the Supreme Court held in *Heller* that the Second Amendment confers an "individual right to possess and carry weapons." 554 U.S. at 592; *id.* at 579 (holding that the Second Amendment, like the First and Fourth Amendments, "unambiguously refer[s] to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body."). As another court in this District recently found, relying on legal disabilities imposed on felons such as the right to serve on a jury, to vote, and to hold elected office proves "both too little and too much. Too little because none of those

14

legal impediments arise out of the Second Amendment. And too much because if it were right, then all other constitutional-rights provisions that use the word 'people' would *categorically* remove felons outside of the protection of the pertinent right." *Agee*, 2023 WL 6443924, at *5 (emphasis in original).

The Court agrees with Jackson, and several courts in this District that "the people" as used in the Second Amendment should be construed in accordance with its use in the First and Fourth Amendments. "Since felons are not excluded from First or Fourth Amendment rights, neither should they be excluded from Second Amendment rights, given the Framer's consistent use of the term 'the people' throughout." *Johnson*, 2023 WL 6690388, at *3. For example, the Fourth Amendment protects "[t]he right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). As the courts in *Johnson*, *Jackson*, and *Agee* pointed out, "felons are not categorically removed from Fourth Amendment protection." *Agee*, 2023 WL 6443924, at *5; *Jackson*, 2023 WL 7160921, at *6; *see also Johnson*, 2023 WL 6690388, at *3. True, in *some* settings, felons may have no or have reduced Fourth Amendment protections. *Agee*, 2023 WL 6443924, at *5 ("Prisoners have no Fourth Amendment right as to prison-cell searches, and that would apply to misdemeanants in prison too. Parolees may be subject to suspicionless searches without the government running afoul of the Fourth Amendment.") (citing *Hudson v. Palmer*, 468 U.S. 517, 526 (1984); *Samson v. California*, 547 U.S. 843, 857 (2006)). But it bears repeating that felons are not *categorically* removed from Fourth Amendment

15

protections. So too with the First Amendment's provision of "the right of *the people* peaceably to assemble." U.S. Const. amend. I (emphasis added); *Agee*, 2023 WL 6443924, at *5; *Jackson*, 2023 WL 7160921, at *6. True, as the Government argues, there are distinctions between the First and Second Amendments, "as the exercise of rights under the First Amendment do not put at risk the physical safety of others." Gov. Suppl. Resp. at 17 (quoting *Price*, 656 F. Supp. 3d at 777). But the Government makes no attempt to—and the Court sees no reason to—distinguish the interpretation of "the people" as used in the Second and Fourth Amendments.

So, even giving less weight to the use of "the people" in the First Amendment, the Court finds that the examples cited by the Government of legal disabilities imposed on felons (i.e., to serve on a jury, vote, and hold elected office)[12] do not outweigh the foregoing counterexamples from the Fourth Amendment when evaluating the Second Amendment's plain text. The Court agrees with Jackson that felons are not categorically excluded from the plain textual scope of the Second Amendment.

Of course, the analysis does not end here, as the Court must now examine whether the Government has met its burden of establishing whether § 922(g)(2) falls within "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

---

[12]That is not to say, however, that the Government's examples are not relevant at step two of the *Bruen* analysis, determining whether historical analogues exist for § 922(g)(1).

16

## IV.    Historical Analogues

Before turning to the substance of the parties' arguments regarding the Nation's historical traditions as they apply to § 922(g)(1), the Court addresses two preliminary matters.

### A. Expert Testimony

First, in his examination of a district court case from the Southern District of Mississippi in his supplemental brief, Jackson notes that the court took issue with the Government's failure to provide any expert historian reports. R. 61, Def. Suppl. Br. at 14, 16 (citing *United States v. Bullock*, 2023 WL 4232309, at *15 (S.D. Miss. June 28, 2023) ("The most disappointing failure is that the party with the burden to prove history and tradition—the United States—did not designate a historian to testify on the analogues, if any, to modern felon-in-possession laws.")). The Government for its part explains that because the Supreme Court in *Bruen* asked courts to answer a question of law, rather than a question of fact or mixed question of law and fact, this Court can analyze the sources presented by the Government without the assistance of an expert. R. 65, Gov. Suppl. Resp. at 17 n.9 (citing *Bruen* 597 U.S. at 25 n.6 (describing its methodological approach as a "legal inquiry" and rejecting the argument that "judges are relatively ill equipped to resolve difficult historical questions or engage in searching historical surveys") (cleaned up)). Here, Jackson does not take issue with the accuracy of the Government's historical sources. *See* Def. Reply at 6–10; R. 68, Def. Suppl. Reply at 3 ("[T]he government's response sets forth our country's historical traditions with respect to firearm possession. Mr.

17

Jackson not only does not disagree with the government's explanation, but he embraces it."). Instead, he argues that the examples cited by the Government are neither distinctly similar nor relevantly similar to § 922(g)(1). Def. Reply at 6–10; Def. Suppl. Reply at 3–8. The Court finds that, absent a dispute about the accuracy of the historical sources, no expert testimony (or any other witness testimony) is required. *See Agee*, 2023 WL 6443924, at \*7; *see also Johnson*, 2023 WL 6690388, at \*3 n.4.

## B. Applicable Standard

Second, Jackson argues that a heightened "distinctly similar" standard should apply to his challenge to § 922(g)(1). Def. Reply at 6–8. According to Jackson, the Supreme Court in *Bruen* established a two-tier system for evaluating firearm regulations, depending on whether the societal concern being addressed existed at the Founding. *Id.* If it did, contends Jackson, the lack of "distinctly similar" regulation from the Founding era responsive to that concern automatically renders the modern regulation unconstitutional. *Id.* at 7. If it did not, merely "relevantly similar" historical regulations will save the modern version. *Id.*

As discussed above, *see supra* Section I, *Bruen* contemplated both "fairly straightforward" and "more nuanced" historical inquiries depending on whether the societal problem existed in the 18th century. 597 U.S. at 26–27. But the Court disagrees with Jackson—and the Fifth Circuit in *United States v. Daniels*, which concluded, without much analysis, 77 F.4th 337, 343 (5th Cir. 2023)—that *Bruen* established different evidentiary burdens. Even in the straightforward case, the

18

absence of distinctly similar historical regulation is merely "*relevant* evidence" of unconstitutionality, not dispositive evidence. *Bruen*, 597 U.S. at 26 (emphasis added). The analysis in *Bruen* supports this conclusion. As the Court stated in *Bruen*, the regulations at issue in both *Heller* and *Bruen* addressed the same societal problem: "firearm violence in densely populated communities." *Id.* at 27. And because "the Founders themselves could have adopted" something like the challenged modern regulation in order to confront said problem, *Heller* "exemplifies this kind of straightforward historical inquiry." *Id.* Because the regulation in *Bruen* involved the "same alleged societal problem addressed in *Heller*," it necessarily also implicated the "fairly straightforward" historical inquiry. *Id.* Therefore, to Jackson's understanding, the Court in *Bruen* should have looked for a "distinctly similar" historical regulatory pattern and ended its analysis upon not finding one. The Supreme Court, however, did no such thing. Instead, the Court embarked on a "journey through the Anglo-American history of public carry," during which it repeatedly compared the burdens imposed by the challenged regulation with those imposed by the historical analogues offered by the Government. *Id.* at 70. That is the methodology the Court identified with the "more nuanced" analysis for isolating "relevantly similar" analogues. *Id.* at 27–29. Indeed, neither the phrase, "distinctly similar," nor "relevantly similar" appear throughout the opinion ("distinctly similar is used just once, whereas "relevantly similar" is used in the majority opinion four times, all before the Court's examination of historical analogues). *See id.* at 26, 28–29.

The Court finds that, even when the general societal concern addressed by the challenged regulation also existed in the Founding era, the question to be answered is whether the regulation is consistent with the nation's historical tradition of firearms regulation.[13] The lack of "distinctly similar" historical regulation is relevant to that question, but it is not dispositive and does not obviate the analogical inquiry described in *Bruen*.

## C. Government's Proffered Analogues

Having determined that no expert testimony is required, and that the Court must only determine whether the historical laws proffered by the Government are relevantly similar to § 922(g)(1), the Court turns to the analogues presented by the Government. As it has in other cases in this District, the Government points to two categories of laws in support of the analogy to § 922(g)(1): (1) "laws categorically disqualifying groups who were untrustworthy adherents to the law from possessing firearms" and (2) "laws authorizing capital punishment and estate forfeiture for felonies." Gov. Suppl. Resp. at 17; *see also Jackson*, 2023 WL 7160921, at *6 (collecting in-District cases evaluating these two types of evidence).

Starting with the first category, the Government first cites to Seventeenth Century English law disarming Catholics, enacted because England found them untrustworthy to obey English law. Gov. Suppl. Resp. at 18–21 (citing, among other sources, 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71–73 (1688) (the

---

[13]And, as discussed below, *see infra* Section IV.C n.17, the Court finds that advancements in firearms technology may make the current general societal concern differ from one that existed in the 18th century. *See Agee*, 2023 WL 6443924, at *10.

English government passed a law in 1689 disarming Catholics who refused to renounce their faith); *Kanter*, 919 F.3d at 456–57 (Barrett, J., dissenting) (observing that the English Parliament disarmed Catholics who "threatened violence and the risk of public injury" and who the Protestant majority found "untrustworthy") (citing Adam Winkler, *Gunfight* 115 (2011)); *Range*, 69 F.4th at 120–21 (Krause, J., dissenting) (after the English Civil War, the Stuart monarchs disarmed non-Anglican Protestants, including pacifists like the Quakers) (collecting sources)). The Court in *Heller* and again in *Bruen* noted that English law is relevant because the Second Amendment "'codified a right inherited from our English ancestors.'" *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599).

Jackson contends, however, that the Court should not rely on English laws from the 1600s, as *Bruen* "specifically condemned using historical tradition that predated the passage of the Second Amendment." Def. Suppl. Reply at 3; *see also* Def. Suppl. Br. at 13 (arguing that the Eighth Circuit in *Jackson* improperly relied on 17th century English laws) (citing *Jackson*, 69 F.4th at 502). True, the Court in *Bruen* stated that "[h]istorical evidence that long predates [adoption of the Second Amendment] may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." 597 U.S. at 34. The Court specified that, "[i]t is one thing for courts to reach back to the 14th century for English practices that prevailed up to the 'period immediately before and after the framing of the Constitution[, and] quite another to rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was

21

acted upon or accepted in the colonies." *Id.* at 34–35 (cleaned up). Moreover, the Court in *Bruen* cautioned that "English common law is not to be taken in all respects to be that of America," and found that English history as it applied to the regulation at issue in *Bruen* was "ambiguous at best." *Id.* at 39 (cleaned up). Here, however, unlike the regulation in *Bruen*, which concerned a general restriction on public firearm carry requiring gun owners to show a special need, § 922(g)(1) is more straightforward (as stated above, it bans convicted felons from possessing firearms), and like other courts in this District, the Court finds that the Government's Seventeenth Century analogues "evince a solid pattern of dispossessing groups of persons deemed to be legally disobedient (or at risk of being so)." *Agee*, 2023 WL 6443924, at *8. Still, the Court gives this evidence minimal weight, because as Jackson points out, the Government cites laws that existed in Seventeenth-century England, but none that existed up to the adoption of the Second Amendment in 1791.

Additionally, in his supplemental reply, Jackson points to the Fifth Circuit's decision in *Daniels*, which "found no class of persons at the Founding who were 'dangerous' for reasons comparable to using marijuana. Marijuana users are not . . . like Catholics and other religious dissenters who were seen as potential insurrectionists." Def. Suppl. Reply at 7–8 (quoting *Daniels*, 77 F.4th at 354). However, *Daniels* involved a different section of the statute, 18 U.S.C. § 922(g)(3), which prohibits anyone from possessing a firearm if he or she is an "unlawful user of a controlled substance." 77 F.4th at 339 (citing § 922(g)(3)). Here, as discussed herein, the Court must determine whether the Government has proffered evidence of a

22

historical tradition of disarming *felons,* not drug users or people addicted to drugs, as was at issue in *Daniels*. And the activity underlying the English dispossession laws—insurrection or treasonous revolt—is a felony. *See United States v. Hall*, 2023 WL 8004291, at *5 (N.D. Ill. Nov. 17, 2023). So, as the court found in *Hall*, Jackson at best "has shown the upper bounds of when firearm dispossession was appropriate." *Id.* Moreover, his arguments do not undermine the fact that England disarmed untrustworthy or dangerous people. It bears repeating that *Bruen* "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 597 U.S. at 30 (emphases in original). True, the English laws targeted groups not identical to felons, but, as other courts in this District have found, "the laws did disarm these groups based on their perceived potential disobedience to the law (or sovereign), and so these laws serve as relevant analogues to the modern felon dispossession statute." *Agee*, 2023 WL 6443924, at *8.

As the Government points out, Catholics could regain the right to keep and bear arms if they decided to declare allegiance to the sovereign. Gov. Suppl. Resp. at 20 n.11. Although Jackson does not explicitly make the argument, the Court finds it important to note that, even with the restoration provision in the English laws, the burden is still "comparable" to that imposed by § 922(g)(1). "[A] felon today [may] regain his right to possess firearms even after that right has been restricted under § 922(g)(1), specifically through expungement or pardon."[14] *United States v. King*,

---

[14]Even so, as the Court in *Washington* pointed out, "[w]hile it is true that felons can theoretically regain their rights under this provision, it has been acknowledged by the Supreme Court that Congress has blockaded this route to relief for more than a quarter of a century." 2023 WL 8258654, at *7 n.3 (citing *Logan v. United States*, 552 U.S. 23, 28 n.1

2023 WL 7936754, at *1 (N.D. Ill. Nov. 17, 2023) (citing *Atkinson*, 70 F.4th at 1026 (Wood, J., dissenting)). And it bears repeating yet again that courts need not track down a "historical twin" corresponding to a modern regulation. 597 U.S. at 30. This Court finds "there is no incongruity in the burdens imposed by § 922(g)(1) and the historical examples the government brings forth," including those that allowed individuals to regain their firearms by swearing an oath. *King*, 2023 WL 7936754, at *1; *see also Washington*, 2023 WL 8258654, at *7.

Next, the Government points to Colonial-era America's dispossession regulations that targeted Native Americans and enslaved Black people. Gov. Suppl. Resp. at 21–22 & n.12 (collecting 17th and 18th century laws directed at disarming these groups). Citing to the out-of-Circuit decision in *Bullock*, as well as the Third Circuit's decision in *Range*, Jackson understandably takes issue with the Government's reliance on such laws that that would unquestionably be unconstitutional today. Def. Suppl. Br. at 11–12, 16 (citing *Range*, 69 F.4th at 104–05; *Bullock*, 2023 WL 4232309, at *11). This Court, like the court in *Washington*, is also troubled by the Government's reliance on such odious laws to support its position. *See Washington*, 2023 WL 8258654, at *6. As other district courts have pointed out, many of the historical laws cited by the Government are deplorable and certainly would not survive a constitutional challenge today. *See Jackson*, 2023 WL

(2007) ("The relief provision has been rendered inoperative, however, for Congress has repeatedly barred the Attorney General from using appropriated funds "to investigate or act upon [relief] applications."); Kari Lorentson, *18 U.S.C. § 922(g)(1) Under Attack: The Case for As-Applied Challenges to the Felon-in-Possession Ban*, 93 Notre Dame L. Rev. 1723, 1726–28 (2018)).

7160921, at *6 (collecting cases finding such laws "unconstitutional," "bigoted," and "shameful"). But, under *Bruen*, courts must examine historical analogues, and "laws disarming enslaved people, religious minorities, and Native Americans—however repulsive to modern sensibilities—fit that bill." *Id.* As with the English laws, Jackson argues that the Court should not consider these Colonial-era laws, as they pre-dated the passage of the Second Amendment. Def. Suppl. Reply at 3. However, unlike the English laws, the Government cited to Colonial laws from the mid-to-late 1700s, Gov. Suppl. Resp. at 22 n.12, and were adopted *by the Colonies*, so are distinct from the "ancient practice[s] that had become obsolete in England at the time of the adoption of the Constitution and *never w[ere] acted upon or accepted in the colonies*" that the Court cautioned against relying on in *Bruen*, 597 U.S. at 35 (cleaned up) (emphasis added). And, unlike the singular 1686 New Jersey Statute in place for only eight years to which the Supreme Court declined to give "meaningful weight" in *Bruen*, 597 U.S. at 49, here, the Government cites to dozens of Colonial laws enacted closer in time to the ratification of the Second Amendment, Gov. Suppl. Resp. at 22 n.12. Like another court recently stated, the Court finds that these laws (as well as the English laws discussed above, to a lesser extent), show that, "[b]y the time of the Second Amendment's ratification in 1791, there already was a historical tradition of legislatures disarming persons based on the perception (sometimes odious perceptions) that certain groups could not be trusted to abide the law or sovereign."[15]

---

[15]As the court in *Agee* stated, this answers *Atkinson*'s third question: whether there are "broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons[.]" *Atkinson*, 70 F.4th at 1024.

*Agee*, 2023 WL 6443924, at *7; *compare Washington* 2023 WL 8258654, at *6 (rejecting "the government's reliance on slavery and discrimination toward Native Americans as historical analogues to Section 922(g)(1) given the regulations impermissible premise cannot impose a 'comparably justified' burden on the right of armed self-defense").

Less problematic are Colonial-era laws that allowed the colonies to disarm members of the political community, including "free, Christian, white men," "whom the authorities believed could not be trusted to obey the law." Gov. Suppl. Resp. at 22–27 (quoting *Range*, 69 F.4th at 122 (Krause, J., dissenting) (citing Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)). For example, the Government points to a 1630s Massachusetts law that disarmed the supporters of an Anne Hutchinson, an outspoken preacher "not because those supporters had demonstrated a propensity for violence," but because "the authorities concluded their conduct evinced a willingness to disobey the law." *Id.* at 22–23 (quoting *Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637–38, 644, 648 (1937)). Additionally, the dissent in *Range*, cited by the Government, describes a 1624 decision by the Virginia Company in which the Virginia Counsel ordered Richard Barnes 'disarmed' and 'banished' from Jamestown" for his 'opprobrious" and 'base' and detracting speeches concerning the Governor." *Id.* at 22 (citing *Range*, 69 F.4th at 122 (Krause, J., dissenting) (citing Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and*

*Policy* 174 (3d ed. 2022))). Again, Jackson argues that these laws are not valid analogies because they pre-dated the Second Amendment's passage. Def. Suppl. Reply at 3. As stated above, because these laws are Colonial, not English laws, the Court gives them some weight; however, like the 1686 New Jersey statute considered by the Court in *Bruen*, the Court cannot give these two 17th century laws significant weight. *See Bruen*, 597 U.S. at 49. Still, the Court considers these laws, of which there were two, as opposed to the "solitary statute" from New Jersey that the Court in *Bruen* declined to give "meaningful weight." *Id.*

The Government also cites to laws in effect during the Revolutionary War that disarmed individuals who did not show loyalty or obedience to the emerging American government. Gov. Suppl. Resp. at 23–24 (citing, among other sources, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890); 4 *Journals of the Continental Congress* 1774–1789, at 205 (1906)); *see Jackson*, 69 F.4th at 503 ("In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty.").[16] Jackson concedes that these laws are "[m]ore applicable." Def. Suppl. Reply at 3. However, as with the English laws, Jackson cites to *Daniels* to argue that the Revolutionary War-era laws are inapt analogies because "marijuana users are not a class of political traitors, as British Loyalists were perceived to be." *Id.* at 7–8.

---

[16]As the court in *Agee* states, this analysis addresses *Atkinson*'s fourth question: whether the historical analogues "supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)[.]"*Atkinson*, 70 F.4th at 1024.

As discussed above, *Daniels* involved a different section of the statute dispossessing drug users, not felons. 77 F.4th at 339. And similar to the English laws, the Court finds that these laws are an apt analogue to § 922(g)(1) in that is shows that the colonies disarmed dangerous people (including those the Government feared would engage in sedition or other traitorous activity). *See Hall*, 2023 WL 8004291, at \*5. Again, it is worth emphasizing that a Court need to rely on a "historical twin" corresponding to a modern regulation. *Bruen*, 597 U.S. at 30.

The Government (and Jackson) next cite to evidence demonstrating that the concept of disarming individuals who could not be trusted to follow the law carried into the Second Amendment's ratification debates. Gov. Suppl. Resp. at 25–27; Def. Suppl. Br. at 7–8. For example, the Pennsylvania Antifederalists proposed a constitutional amendment stating that, "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." Gov. Suppl. Resp. at 25 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 665 (1971) (emphasis in Government's Brief)); Def. Suppl. Br. at 7–8 (citing Carlton F. W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371, 1375 (2009)). And at the Massachusetts convention, Samuel Adams proposed that gun rights be limited to "peaceable citizens." Gov. Suppl. Resp. at 26 (citing Schwartz, *The Bill of Rights: A Documentary History* at 675, 681); Def. Suppl. Br. at 7 (citing Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. at 1374). True, as Jackson contends, the Second

Amendment as adopted does not explicitly disarm individuals based on commission of a crime. Def. Suppl. Br. at 7–8; Def. Suppl. Reply at 4. But, as the Government points out, the existence of the proposals supports the proposition that it would have been "obvious" to the Founders that certain groups, including felons, could properly be subject to disarmament laws consistent with the *pre-existing* right" that was "codified" in the Second Amendment. Gov. Suppl. Resp. at 26 (emphasis in original) (quoting *Bruen*, 597 U.S. at 20 and citing Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that the Founders "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood")). As the Court held in *Bruen*, "'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" 597 U.S. at 34 (emphasis in original) (quoting *Heller*, 554 U.S. at 634–35). Moreover, *Atkinson*'s second question directs courts to examine the relevance of "proposals emerging from the states' constitutional ratifying conventions." *Atkinson*, 70 F.4th at 1023.

The Court turns to the second category of historical regulations cited by the Government: laws punishing felons. The Government again turns to 18th Century English law and colonial law. Capital punishment and estate forfeiture for felony convictions were authorized under English law and in many American colonies up to the time of the Founding. Gov. Suppl. Resp. at 27 (citing 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769); *Medina v. Whitaker*, 913 F.3d 152,

29

158 (D.C. Cir. 2019); *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002))). The First Congress—which drafted and proposed the Second Amendment—made various felonies, including nonviolent felonies like forgery, punishable by death. *Id.* at 27–28 (citing *An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112–15 (1790)). Felonies, including nonviolent felonies, continued to be punishable by capital punishment or estate forfeiture throughout the 18th century. *See id.* at 27–30 (collecting historical laws); *see also Medina*, 913 F.3d at 158 ("[A]t the time of the Second Amendment's ratification, nonviolent crimes such as forgery and horse theft were capital offenses."). The Court agrees with the court in *Agee* that "[a]s a matter of logic and experience, it makes sense that these extensive and exhaustive penalties for felonies—outright capital punishment and the forfeiture of all property—qualify as powerful evidence that mere firearms dispossession of felons is a 'comparable burden,' as *Bruen* frames the standard, to historical punishments for felonies." 2023 WL 6443924, at *10 (quoting *Bruen*, 597 U.S. at 29)); *see also Medina*, 913 F.3d at 158 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."); *Jackson*, 69 F.4th at 503 ("Early legislatures . . . authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for nonviolent offenses involving deceit and wrongful taking of property."). *But see Prince*, 2023 WL 7220127, at *9 (despite agreeing with the D.C. Circuit in *Medina* that "capital

30

punishment and estate forfeiture laws imposed severe consequences on certain felons, [the court] also agree[d] with the Third Circuit in *Range* that these consequences 'do[ ] not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition.'" (citing *Medina*, 913 F.3d at 158 and quoting *Range*, 69 F.4th at 105)).

In reply, Jackson argues that neither the death penalty nor estate forfeiture are "distinctly similar" to felon dispossession. Def. Reply at 8. Citing to then-Judge Barrett's dissent in *Kanter*, Jackson maintains that "the consequences of a felony conviction were not as categorically severe as the government suggests." *Id.* at 8 (quoting *Kanter*, 919 F.3d at 459, 461 (Barrett, J., dissenting)). Then-Judge Barrett noted in dissent that (1) historically, states did not punish many—much less all—felons with the death penalty, and (2) simply because felons lost rights (like free speech) via execution at the time of the Founding, states are not authorized to deprive felons of any and all rights today. *Kanter*, 919 F.3d at 459, 461–62. But as the Government points out in its supplemental response, the *Kanter* dissent also recognized that "history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens." Gov. Suppl. Resp. at 30 (quoting 919 F.3d at 462). Although the dispossession of such civic rights was not dispositive of the interpretation of the plain text of the Second Amendment, the Court finds it relevant to the current analysis as to what rights felons were guaranteed by the Second Amendment through the eyes of the Framers. And, beyond arguing that estate

forfeiture is not "distinctly similar" to felon dispossession, Jackson does not substantively address the Government's argument that many felons were punished with estate forfeiture, which the Court finds to be a closer analogue than the death penalty to the dispossession of firearms. Def. Reply at 8.

All in all, this Court agrees with the majority of district courts in this Circuit (and nationwide) that the Government has met its burden of demonstrating that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation" and "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[17] *Bruen*, 597 U.S. at 17, 19, 24.

---

[17]Although not argued by either party, the Court also finds persuasive the reasoning in *Agee*, that firearms technology—and by proxy firearms-related problems—have advanced rapidly since the Second Amendment was ratified in 1791. 2023 WL 6443924, at *10. As discussed above, the Supreme Court in *Bruen* stated that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," 597 U.S. at 27, and *Atkinson*'s first question is whether § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century[,]" 70 F.4th at 1023. As the court in *Agee* notes, "advancements in firearms technology—both in sheer firepower and accessibility— must be considered when deciding how close a fit the modern felon-dispossession statute must be to historical regulations that dispossessed groups of non-law-abiders (at least as perceived at the time) and that authorized broad punishment of felons (again, at least at that time)." 2023 WL 6443924, at *10. The court points out that the Supreme Court has held that the Second Amendment's reference to "arms" includes not only those in existence in the 18th century, but also includes "modern instruments that facilitate armed self-defense." *Id.* at *11 (quoting *Bruen*, 597 U.S. at 28). Therefore, reasons the *Agee* court, "[i]t would be incongruous to consider the firepower and accessibility of modern-day firearms as covered by the Second Amendment when deciding how expansive the right to bear arms is (or is not), yet refuse to consider the firepower and accessibility of modern-day firearms when deciding the constitutionality of potential limitations on that very same right." *Id.* The Court agrees that taking such technological developments into account bolsters the finding that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation" and "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 17, 19, 24.

## V.     As-Applied Challenge

Finally, Jackson summarily argues that § 922(g)(1) is unconstitutional "as applied" to him. Mot. Dismiss at 2, 4, 7; Def. Reply at 9; Def. Suppl. Br. at 21. Like the defendants in *Atkinson* and *Agee*, Jackson does not provide "much historical basis for individualized assessments" or carveouts between "individuals who committed violent versus nonviolent crimes" for § 922(g)(1) purposes.[18] *Agee*, 2023 WL 6443924, at *10 (quoting *Atkinson*, 70 F.4th at 1023). Jackson contends that "individualized assessments may be required by the Second Amendment, but with the focus not on whether someone has a felony conviction, or whether it was violent or nonviolent, but whether the person remains dangerous." Def. Suppl. Br. at 21. From Jackson's point of view, "it is the characteristics of the person that are relevant," and pursuant to that assessment, the statute is unconstitutional as applied to him. *Id.* As stated above, Jackson was convicted twice in 2006 for manufacture or delivery of a controlled substance. As another Court in this District recently found, "[g]iven the well-recognized connection between drug trafficking and guns, application of § 922(g)(1)'s prohibition in this case is constitutional as applied to [Jackson] even if it may not be sustained in other applications." *United States v. Watson*, 2023 WL 6623774, at *6 (E.D. Wis. Oct. 11, 2023) (citing *United States v. Ramirez*, 45 F.3d 1096, 1103 (7th Cir. 1995) ("this court has recognized that weapons are tools of the narcotics trade")); *see also Jackson*, 2023 WL 7160921, at *7–8 (rejecting as-applied challenge by

---

[18]Without argument or evidence from Jackson in support of an individualized assessment for violent versus non-violent predicate felonies, the Court concludes the answer to *Atkinson*'s fifth question is that there is no basis for individualized assessment based on whether the felony was violent.

defendant with prior narcotics felonies); *Price*, 656 F. Supp. 3d at 775 (noting that defendant's "narcotics-related convictions are indicative of dangerous activity") (citing *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) ("[d]rug crimes are associated with dangerous and violent behavior and warrant a higher degree of precaution")). An as-applied challenge is rejected.

### Conclusion

For the foregoing reasons, Jackson's motion to dismiss the indictment [52] is denied.

Dated: December 12, 2023

United States District Judge
Franklin U. Valderrama